# United States Tax Court

T.C. Memo. 2023-152

WHISTLEBLOWER 972-17W,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 972-17W.                              Filed December 21, 2023.

————————

*George Munoz*, for petitioner.

*Ryan Z. Sarazin*, *Ka Tam*, *Bartholomew Cirenza*, and *Stephen C. Welker*, for respondent.

## MEMORANDUM OPINION

TORO, *Judge*: Petitioner is a whistleblower who reported to the Internal Revenue Service (IRS) that several individuals had failed to comply with their tax obligations. The Government pursued actions against three of the individuals (Targets 1, 2, and 3) (including criminal actions with respect to two of the targets) and ultimately collected proceeds from each of them. But the IRS Whistleblower Office (WBO) denied the whistleblower's claim for an award under section 7623(b).[1] The WBO acknowledged to the whistleblower that "[t]he IRS reviewed the information you provided as part of an ongoing investigation/examination of the taxpayer(s)." Yet, the WBO explained, "that review did not result in the assessment of additional tax, penalties,

———————————

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C.), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[*2] interest or other amounts with respect to the issues you raised." The WBO further noted that "[t]he IRS did assess additional tax, penalties, interest or additional amounts but the information you provided was not relevant to those issues." The whistleblower timely petitioned our Court for review.

In a previous opinion we resolved certain issues related to our jurisdiction and section 6103. *See Whistleblower 972-17W v. Commissioner*, 159 T.C. 1 (2022) (reviewed). Now before us are two motions, a Motion for Summary Judgment filed by the Commissioner of Internal Revenue and a Motion to Remand filed by petitioner. Essentially, the Motions ask us to decide (1) whether the WBO's determination to deny petitioner's claim has sufficient support in the administrative record and does not represent an abuse of discretion or (2) whether the determination should be remanded to the WBO for further consideration. For the reasons set out below, we find that the record, although imperfect, sufficiently justifies the WBO's determination to deny an award and that the WBO's decision does not reflect an abuse of discretion. Moreover, we see no need for a remand. We therefore will grant the Commissioner's Motion and deny petitioner's Motion.

*Background*

The following facts are derived from the pleadings, the parties' Motion papers, the Declarations and Exhibits attached thereto, and the administrative record filed with the Court, as supplemented. These facts are stated solely for the purpose of ruling on the Motions before us and not as findings of fact in this case. *See Whistleblower 769-16W v. Commissioner*, 152 T.C. 172, 173 (2019).

I.    *Petitioner's Whistleblower Claims*

During 2008, petitioner was an employee of Company A. At that time, the IRS's Small Business/Self-Employed Division (SB/SE) was examining Company A's failure to pay employment taxes for two tax years. An IRS revenue officer, who was part of SB/SE's collection function (Revenue Officer A), had responsibility for Company A's examination.

On February 27, 2008, Revenue Officer A interviewed petitioner in connection with petitioner's role at Company A. At the interview, they discussed issues relating to Company A's employment tax examination.

**[*3]**     Before the February 27 interview, Revenue Officer A had already considered referring Targets 2 and 3 for fraud investigations related to issues she had identified during Company A's examination. (Targets 1, 2, and 3 were all part of the management team or otherwise involved with Company A.)  She had scheduled at least one meeting with an IRS Fraud Technical Advisor for February 28, 2008, to discuss her concerns and was actively investigating the potential fraud.  She continued to develop the issues after the February 27 interview and had another meeting scheduled with the Fraud Technical Advisor when petitioner contacted her a few months later, on June 9, 2008, to request a second conversation.  Revenue Officer A scheduled that conversation for the same day as her upcoming meeting with the Fraud Technical Advisor.

During petitioner's second meeting with Revenue Officer A, petitioner told her that petitioner had resigned from Company A and wanted to provide information to show that Targets 2 and 3 were committing fraud and not reporting at least $11 million in income. Petitioner made some additional comments about Targets 2 and 3, including alleging that Target 3 had a practice of buying companies, stripping them of assets, and filing for bankruptcy.  Revenue Officer A's contemporaneous summary of the meeting states: "I discussed with [the Fraud Technical Advisor] who advised me to provide [to petitioner] information on recently implemented whistleblower procedures and not to accept any records from [petitioner]."  It further states: "I advised [petitioner] that I cannot accept any information or records from [petitioner], and that [petitioner] needs to follow whistleblower procedures."

On July 1, 2008, the WBO received from petitioner a Form 211, Application for Award for Original Information.  A letter attached to the Form 211 listed the names of seven individuals, including Targets 1, 2, and 3.   The letter asserted that the seven individuals "executed schemes" that "involved tax evasion and fraud," that "there have been numerous violations of Federal tax laws," and that, "[i]n aggregate, premeditated tax fraud by this group runs into the tens of millions of dollars."  The letter did not include specific or detailed allegations, but rather requested an in-person meeting with the WBO in a specific location.

Also attached to the Form 211 was a second Form 211 executed by a different whistleblower.  (Petitioner's letter refers to the other whistleblower as "a knowledgeable associate.")  The second Form 211 named Target 1 and made more specific allegations, including

[*4] allegations related to "us[ing] 'shell,' non reporting, pink sheet entities to self deal," "stock schemes used to avoid taxes," "erroneous returns," "abuse of expense reporting," and the use of company money to purchase "private items."[2] Referring to this additional Form 211, petitioner's letter stated that "[t]he included information from [the other whistleblower] is endemic of the actions I allege occurred at [Company A]."

On July 8, 2008, petitioner called Revenue Officer A. When she returned petitioner's call, petitioner advised her that the Forms 211 had been filed. Revenue Officer A's contemporaneous summary of the call reports that she told petitioner that she could not discuss the matter with petitioner.

Sometime in July or August, and following further discussions with the Fraud Technical Advisor, Revenue Officer A referred Targets 2 and 3 to the IRS's Criminal Investigation Division (CID) for a potential fraud investigation. Unbeknownst to Revenue Officer A, Target 3 had already been referred to CID by the IRS's Large and Mid-Size Business division (LMSB), although that investigation was not moving forward expeditiously.

II.   *The WBO's Processing of Petitioner's Claims*

After receiving petitioner's claims, the WBO assigned a claim number to each of the seven named targets. The WBO initially forwarded petitioner's claims to SB/SE on March 18, 2009, more than seven months after petitioner submitted the Form 211 and more than six months after Revenue Officer A referred Targets 2 and 3 to CID. But SB/SE believed that Target 3 was already being examined by LMSB and returned all the claims to the WBO without taking action. The WBO then shared the information with LMSB on July 30, 2009. But because Targets 2 and 3 were actually under investigation by CID, LMSB also returned the information to the WBO without taking action. Finally, the WBO sent the claims to CID on September 2, 2009.

---

[2] In the months after petitioner's initial Form 211 submission, the other whistleblower continued to submit documents to the WBO, primarily regarding Target 1. Petitioner did not submit additional documents to the WBO until 2015, as we describe further below. Petitioner did, however, have informal discussions with the WBO and other IRS personnel, as well as provide documents to IRS personnel outside the WBO, as we also describe further below.

**[\*5]**   Over the next year, the WBO corresponded with CID, seeking information about whether petitioner's claims had been useful to its investigations and whether further investigations would be opened. This information proved difficult to obtain.  Eventually, however, after numerous emails and phone calls from the WBO, CID confirmed in early November 2010 that it was investigating only Targets 2 and 3 and that the other targets named in petitioner's Form 211 could be pursued by other divisions of the IRS.  CID further provided a Form 11369, Confidential Evaluation Report on Claim for Award, pertaining to Target 3, with attached memoranda, indicating that petitioner's information was not helpful to its investigations of Targets 2 and 3.

On November 29, 2010, the WBO referred petitioner's claims (other than those related to Targets 2 and 3) back to SB/SE, informing that division that it was free to pursue any appropriate actions against those targets (that is, the five individuals other than Targets 2 and 3).[3] A revised version of the information was sent on January 12, 2011.  The WBO emphasized that SB/SE should not take any action with respect to Targets 2 and 3.

On May 18, 2011, CID confirmed that the criminal investigation of Target 2 had been closed and that other divisions of the IRS could proceed against Target 2 if desired.  Shortly thereafter, the WBO prepared a transmittal memo to refer petitioner's Target 2 claims back to SB/SE.

III.   *IRS Proceedings Against the Targets*

At various times before and after the WBO received petitioner's Form 211 and forwarded the information to operating divisions of the IRS, different divisions proceeded with civil and criminal actions related to Targets 1, 2, and 3.  We detail the actions for each target below, including, where relevant, any involvement by the WBO and petitioner.

A.   *Target 1*

Target 1 was a serial nonfiler who did not file federal income tax returns from 2003 to 2010.  The IRS prepared substitutes for returns for most of those years and assessed the tax shown on those returns.

---

[3] The five individuals included Target 1 and four other individuals against whom the IRS took no administrative or judicial action.

**[\*6]** On January 28, 2011, after the WBO referred petitioner's claims to SB/SE for the second time, petitioner was interviewed by a revenue agent regarding Target 1. During the interview, petitioner stated that petitioner had no information related to Target 1, but that the other whistleblower (the knowledgeable associate referenced in petitioner's Form 211) would be able to provide details. Petitioner explained that petitioner was more familiar with the other individuals mentioned in the letter petitioner had attached to the Form 211. After recounting an innocuous business interaction with Target 1, petitioner again confirmed that petitioner had no further details regarding the information provided in the other whistleblower's Form 211, which had mostly discussed Target 1.

Target 1's collection case was assigned to Revenue Officer A on September 27, 2011. Revenue Officer A ultimately obtained delinquent returns from Target 1 for tax years 2003 to 2011 and referred the returns for 2009 and 2010 to another agent for processing and examination. After consulting with Revenue Officer A, the agent determined that an in-depth examination of the returns was unwarranted because Target 1 already had a large outstanding liability (more than $430,000) from the delinquent returns, and Revenue Officer A had determined that collection potential was limited. Accordingly, the agent conducted a limited scope examination and, in August 2012, proposed increases in tax, penalties, and interest for 2009 and 2010 of $29,754 and $15,931, respectively. For 2009, the adjustments generally related to gross receipts not reported on Schedule C, Profit or Loss From Business, that the agent identified after interviewing Target 1 and performing a bank deposits analysis. For 2010, the adjustments related to the disallowance of deductions for a loan made to another business and certain business expenses. Target 1 agreed with the adjustments.

On October 9, 2012, the agent who conducted the examination of Target 1 prepared Form 11369 recommending that petitioner receive no award. The form recounted the history described above and further stated that petitioner's information was not useful to the examination, that petitioner had provided no documents or contact information, and

**[*7]** that petitioner did not specifically identify the sources of the unreported income that Target 1 had allegedly received.[4]

Attached to the Form 11369 was a memorandum prepared by Revenue Officer A describing her own involvement in the case. Revenue Officer A reported that the information petitioner provided to the WBO was never shared with her as it was several years old. She further stated that she had declined to receive the information because, in her view, it would not have been relevant or helpful to her collection case.

B. *Target 2*

In connection with Company A's employment tax examination, the IRS ultimately assessed trust fund recovery penalties totaling approximately $577,000 against Target 2, plus interest. On or around June 6, 2008 (i.e., before petitioner met with Revenue Officer A for a second time or filed the Form 211 with the WBO), Revenue Officer A "[m]ailed [a] completed [trust fund recovery penalties] package to Tech Advisory" and sent Target 2 a Letter 1058, Notice of Intent to Levy, with respect to Target 2's personal liability for the trust fund penalties. Revenue Officer A retained responsibility for collection actions with respect to the trust fund penalties assessed against Target 2.

During the employment tax examination, Revenue Officer A also determined that Target 2 had regularly written large checks from Company A to Target 2 and failed to report the corresponding income on federal income tax returns. Additionally, Revenue Officer A determined that Target 2 had not filed a federal income tax return for other years. Accordingly, as already discussed, Revenue Officer A made a criminal referral to CID relating to Target 2 sometime in July or August 2008.

In addition to confirming Revenue Officer A's findings, CID's initial investigation of Target 2 revealed that Target 2 may have prepared tax returns for another individual that did not report more than $30 million of income. CID formally opened a criminal investigation of Target 2 to determine any potential tax violations related to these actions and those Revenue Officer A had identified.

---

[4] With regard to certain supplemental materials (stock certificates, a promissory note signed by Target 1, and a deposition given by Target 1) the other whistleblower submitted to the WBO, the Form 11369 stated that the documents indicated a source of income but that, because Target 1 reported substantial income on the relevant returns, it was likely that the target had reported the income.

[*8] After a CID agent interviewed Target 2, Target 2 filed amended tax returns reporting the previously omitted income from Company A that Revenue Officer A had identified. Target 2 also filed the tax returns that Target 2 had previously failed to file. Once Target 2 took these actions, CID discontinued its investigation in April 2010 because of concerns about jury appeal. Nevertheless, on June 30, 2010, CID proceeded with an interview it had scheduled with petitioner regarding Target 2. At the interview, petitioner provided certain information regarding Target 2's history with Target 3, Company A, and another company that Company A had acquired. Petitioner also relayed certain allegations of misconduct against Target 2. After the interview, petitioner provided contact information for certain individuals connected with Target 2 or Company A. Petitioner also called a CID agent after the investigation was closed to make further allegations against Target 2 and Target 3 related to a separate company (Company C). The CID agent was not able to investigate these claims.

On August 14, 2012, SB/SE opened an examination of Target 2's tax returns for 2009 and 2010. SB/SE ultimately identified unreported income of $5,700 for 2009 and $3,705 for 2010. These amounts generally were fees Target 2 received for preparing tax returns for clients in the relevant years. SB/SE disallowed an exemption of $3,650 claimed for Target 2's child, who was over 18. Target 2 agreed with the proposed adjustments, and the examination was closed.

The agent who conducted the examination of Target 2's returns provided to the WBO a Form 11369 with a narrative attachment. In the attachment, the agent stated that petitioner did not make specific allegations regarding Target 2 or provide any specific information that assisted with her examination.

C. *Target 3*

Target 3 initially came to the IRS's attention as early as 2005, when CID opened an investigation of Target 3's activities. But this investigation had not led to any charges by 2008.

Eventually, in connection with the employment tax examination of Company A, the IRS ultimately assessed trust fund penalties and interest totaling more than $1 million against Target 3. On or around June 6, 2008 (i.e., before petitioner met with Revenue Officer A for a second time or filed Form 211 with the WBO), Revenue Officer A "[m]ailed [a] completed [trust fund recovery penalties] package to Tech

[*9] Advisory" and sent Target 3 a Letter 1058, with respect to Target 3's personal liability for the trust fund penalties.

CID received an IRS Collection Referral relating to Target 3 sometime in July or August 2008, stemming from Revenue Officer A's examination of Company A. The CID agent who received the referral (CID Special Agent A) determined that Target 3 had received several million dollars of dividends from Company B and that Company B had not filed corporate income tax returns for several years. Following these findings, CID started a criminal investigation of the new claims related to Target 3.

During the ensuing investigation, CID Special Agent A reviewed the Form 211 petitioner submitted to the WBO, met with petitioner multiple times, and received certain documents from petitioner. These documents included an organization chart showing entities and individuals linked to Target 3, various corporate filings by entities linked to Target 3, and printouts of online forum discussions regarding alleged wrongdoing by Target 3 and other individuals, including Targets 1 and 2. Many of the documents related to an entirely different company (Company C); they generally did not relate to Company A (where petitioner worked) or Company B (the focus of CID's investigation). The documents also included one canceled check for $350,000, apparently executed by Target 3, that the agent labeled a "Diverted Check." The record includes a few pages of handwritten notes CID Special Agent A made during his meetings with petitioner.

In September and November 2010, CID Special Agent A told the WBO that petitioner's information had not assisted with his ongoing investigation. In addition to conveying this point via email, he also submitted a Form 11369. In an attached narrative the agent said that the investigation was started independently of petitioner's information and that contacts with petitioner did not provide any supporting evidence. He elaborated that petitioner did not have first-hand knowledge of or work at the company that was the primary focus of the investigation (Company B).

Target 3 ultimately was charged with various tax-related offenses. Target 3 was tried and convicted in 2012 and, by mid-2013, had been sentenced. Specifically, Target 3 was convicted of corrupt interference with the internal revenue laws, multiple counts of failure to file a corporate tax return, and two counts of failure to file a personal tax return. Target 3 was sentenced to a period of imprisonment and

**[\*10]** ordered to pay restitution to the IRS. The IRS assessed almost $60 million in connection with Target 3's conviction, although the record does not disclose how much of this amount has been collected to date.

IV. *Petitioner's Supplemental Information and the WBO's Determination*

In 2013, petitioner obtained legal representation to handle the WBO claims. By 2015, petitioner still had not heard from the WBO, and that year petitioner's counsel made a series of written submissions to the WBO, requesting an update on petitioner's claims and explaining why petitioner was entitled to an award. The supplemental information shared with the WBO included an affidavit from petitioner. The affidavit recounted some of the history described above and described petitioner's meetings with CID to discuss Target 3. The affidavit further stated that, shortly after these meetings began, Target 1 contacted petitioner and angrily yelled at petitioner for reporting Target 1 and others to the IRS. Petitioner reported this interaction to CID Special Agent A, and the agent told petitioner to let him know if it happened again. The affidavit expressed petitioner's view that the information and cooperation petitioner gave to Revenue Officer A and CID agents had allowed the IRS to proceed with various actions against Targets 1, 2, and 3. Attached to the affidavit were supporting documents, including business cards from IRS agents petitioner had spoken to, the organization chart petitioner provided to CID regarding Target 3 and related entities, various public records regarding tax liens the IRS had recorded against the targets, and records related to Target 3's conviction and sentencing. In another submission, petitioner provided several news articles relating to Target 3 and a draft "Preliminary Award Memorandum" with proposed facts that petitioner thought supported a positive award determination.

On October 17, 2016, the WBO issued a preliminary denial letter to petitioner that proposed to deny all petitioner's claims for an award. Petitioner's counsel sent a response to the WBO on November 14, 2016. The response reiterated information from petitioner's 2015 letters, alleged that CID Special Agent A had continued to encourage petitioner to provide information up to 2012, and alleged that petitioner had provided Revenue Officer A helpful information that had allowed the IRS to collect from Targets 1 and 2 (for example, information regarding the location of assets).

**[\*11]** On December 5, 2016, a WBO analyst completed a memorandum recommending that petitioner's claims be denied. Regarding Target 1, the memorandum generally stated that petitioner's information had not identified the sources of Target 1's alleged unreported consulting income and was not useful to the SB/SE examination. Regarding Target 2, the memorandum generally stated that SB/SE's collection personnel had already initiated proceedings against Target 2 before petitioner submitted any information, that CID had ultimately dropped its investigation of Target 2, and that Revenue Officer A, who was handling the collections action, had never reviewed the Form 211 information regarding Target 2. Regarding Target 3, the memorandum generally stated that CID had already opened an investigation of Target 3 before receiving petitioner's information and that the information did not assist CID with any existing investigations or with any new investigations.

On December 13, 2016, the WBO issued its final determination letter denying all of petitioner's claims for an award and making the observations we set out at the beginning of this Opinion.

*Discussion*

I.     *Summary Judgment Standard in Whistleblower Cases*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). Under Rule 121(a)(2), which articulates the general standard for evaluating a summary judgment motion, we may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. *See Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). But this standard "is not generally apt" when reviewing whistleblower award determinations because, in such a case, there is no trial on the merits. *Van Bemmelen v. Commissioner*, 155 T.C. 64, 78–79 (2020). Rather, in a whistleblower case, where we review agency action under the Administrative Procedure Act, we generally "confine ourselves to the administrative record to decide whether there has been an abuse of discretion." *Id.* at 78.

Our rules recognize this distinction, clarifying that in cases in which judicial review is based solely on the administrative record, Rule 121(a)(2) does not apply, and the parties must provide

**[\*12]** "statement[s] of facts with references to the administrative record." Rule 121(j). In this context, summary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record, or whether the WBO's determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Van Bemmelen*, 155 T.C. at 72 (quoting *Kasper v. Commissioner*, 150 T.C. 8, 21 (2018)). In conducting this analysis, we do not substitute our judgment for that of the agency, but instead confine ourselves to ensuring that its determination was "within the bounds of reasoned decisionmaking." *Id.* (quoting *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019)). With respect to factual matters, this includes accepting the agency's determinations so long as they are not clearly erroneous. *See Kasper*, 150 T.C. at 23 (citing *Fargo v. Commissioner*, 447 F.3d 706, 709 (9th Cir. 2006), *aff'g* T.C. Memo. 2004-13).

II.    *Section 7623*

Section 7623 provides for awards to individuals (commonly referred to as whistleblowers) who submit information to the Government about third parties who have underpaid their taxes or otherwise violated the internal revenue laws. Section 7623(a) authorizes discretionary payments in certain circumstances, while section 7623(b) provides for nondiscretionary (i.e., mandatory) awards.

A.    *Mandatory Awards*

Under section 7623(b)(1), a whistleblower generally is entitled to a mandatory award if the Secretary of the Treasury proceeds with an administrative or judicial action based on information provided by the whistleblower and collects proceeds as a result of the action.[5] The amount of the award generally is between 15% and 30% of the collected

---

[5]    Sec. 7623(b)(1). In general.—If the Secretary proceeds with any administrative or judicial action described in subsection (a) based on information brought to the Secretary's attention by an individual, such individual shall, subject to paragraph (2), receive as an award at least 15 percent but not more than 30 percent of the proceeds collected as a result of the action (including any related actions) or from any settlement in response to such action (determined without regard to whether such proceeds are available to the Secretary). The determination of the amount of such award by the Whistleblower Office shall depend upon the extent to which the individual substantially contributed to such action.

**[\*13]** proceeds, depending on the extent to which the whistleblower substantially contributed to the action.  I.R.C. § 7623(b)(1).

Regulations under section 7623 provide guidance in interpreting the statutory standard.  As relevant here, the regulations define an "administrative action" as "all or *a portion of* an [IRS] civil or criminal proceeding against any person that may result in collected proceeds . . . including, for example, an examination, a collection proceeding, a status determination proceeding, or a criminal investigation."  Treas. Reg. § 301.7623-2(a)(2) (emphasis added).  Similarly, a "judicial action" means "all or a portion of a proceeding against any person in any court that may result in collected proceeds."  *Id.* subpara. (3).  The regulations further state that the IRS proceeds based on a whistleblower's information

> when the information provided substantially contributes to an action against a person identified by the whistleblower. For example, the IRS proceeds based on the information provided when the IRS initiates a new action, expands the scope of an ongoing action, or continues to pursue an ongoing action, that the IRS would not have initiated, expanded the scope of, or continued to pursue, but for the information provided.  The IRS does not proceed based on information when the IRS analyzes the information provided or investigates a matter raised by the information provided.

*Id.* para. (b)(1).

The U.S. Court of Appeals for the District of Columbia Circuit recently upheld and clarified this standard in *Lissack v. Commissioner*, 68 F.4th 1312 (D.C. Cir. 2023), *aff'g* 157 T.C. 63 (2021), *petition for cert. filed*, No. 23-413 (Oct. 19, 2023).  In relevant part, the D.C. Circuit held that, for a whistleblower to be entitled to an award under the regulation, the IRS must take "action on the discrete tax issue or issues the whistleblower's information identifies."  *Id.* at 1324.  To show that the IRS proceeded with an administrative action based on a whistleblower's information, therefore, the whistleblower must do more than establish that the IRS opened an examination based on the information. Demonstrating this kind of "but for" cause is insufficient because, in the D.C. Circuit's words, "there is ample reason to doubt that Congress meant to entitle whistleblowers to substantial awards just for raising plausible but meritless concerns about taxpayers who, on investigation

**[\*14]** by the IRS, turn out to be noncompliant in some other, unrelated way." *Id.* Instead, whistleblowers must "identify underpayments and provide information that advances to some substantial degree the IRS's recovery of those underpayments." *Id.* Put another way, for a whistleblower to be entitled to an award, the whistleblower's information must substantially contribute to the portion of an examination that results in the collection of proceeds. *See id.*; *see also* Treas. Reg. § 301.7623-2(b)(2) (examples 2 and 3).

### B. *Judicial Review*

If, as in this case, the IRS proceeds with administrative or judicial action against one or more targets identified by a whistleblower and the WBO ultimately declines to grant an award, then the whistleblower may petition our Court for review of the WBO's determination, and we have jurisdiction to review the determination. *See* I.R.C. § 7623(b)(4); *Lissack v. Commissioner*, 68 F.4th at 1321; *Whistleblower 972-17W*, 159 T.C. at 9. We have already resolved the jurisdictional issues in this case and do not repeat that analysis here. *See Whistleblower 972-17W*, 159 T.C. at 7–11. Instead, we turn to the merits.

### III. *Analysis*

### A. *Target 1*

The amounts assessed by the IRS against Target 1 consist of (1) amounts Target 1 reported on delinquent returns secured by Revenue Officer A and (2) amounts assessed after the limited scope examination of Target 1's 2009 and 2010 returns. We see no abuse of discretion by the WBO with respect to either category.

To begin, petitioner's Form 211 contained no specific allegations regarding Target 1. It did not allege that Target 1 had failed to file tax returns, nor did it allege that Target 1 had failed to report income or erroneously deducted business expenses.[6] When the IRS interviewed petitioner regarding Target 1 in 2011, petitioner stated that petitioner had no information regarding Target 1. Additionally, the record

---

[6] Even if we were to attribute the information in the second whistleblower's Form 211 to petitioner, our conclusion would not change. Nearly all the allegations in that form were unrelated to the adjustments the IRS ultimately made. And to the extent the form alleged that Target 1 had failed to report income, it did not provide specific information that could have substantially contributed to the IRS's assessments.

**[*15]** includes a fairly detailed account of the examination of Target 1's 2009 and 2010 returns, and there is no indication that petitioner contributed to the examination. Both the revenue agent who handled Target 1's examination and Revenue Officer A confirmed that they did not use petitioner's information in their actions related to Target 1.

In view of these facts, we see no abuse of discretion because the record supports the WBO's determination with respect to Target 1 and the WBO's determination was within the bounds of reasoned decisionmaking. Petitioner does not appear to dispute this conclusion, as neither petitioner's Response to the Commissioner's Motion for Summary Judgment (Response) nor petitioner's Motion to Remand discusses Target 1.

> B.    *Target 2*

The amounts assessed by the IRS against Target 2 consist of (1) trust fund penalties and interest related to Company A's employment tax examination and (2) modest amounts assessed after the examination of Target 2's 2009 and 2010 returns.[7]

Taking the trust fund penalties first, petitioner does not appear to argue that petitioner's information contributed to the outcome of the IRS's examination of Company A. Moreover, the record contains no indication that petitioner's whistleblower information substantially contributed to that examination. The examination was initiated before petitioner provided any information to the IRS, and Revenue Officer A's examination activity record indicates that, before her second meeting with petitioner, Revenue Officer A had already "[m]ailed [a] completed [trust fund recovery penalties] package to Tech Advisory" and sent Target 2 a Letter 1058 with respect to Target 2's personal liability for

---

[7] We need not address whether the amounts Target 2 voluntarily reported and paid after being approached by CID could qualify as collected proceeds because the record indicates that those amounts, as well as Target 2's failure to file returns, were discovered by the IRS without petitioner's assistance. (Nor does petitioner appear to argue that we should consider those amounts.) For example, Revenue Officer A's examination activity record indicates that she had identified Target 2's unreported income and discussed it with the Fraud Technical Advisor by the day after her first meeting with petitioner. And Revenue Officer A's detailed notes summarizing her first two meetings with petitioner (in February and June 2008) contain no allegations that Target 2 had failed to file income tax returns and no specific allegations that Target 2 had failed to report income. Finally, at her second meeting with petitioner, Revenue Officer A informed petitioner that she could not accept any information or records from petitioner.

**[\*16]** the trust fund penalties. Moreover, the record does not suggest that any information petitioner ultimately provided as a whistleblower related to Company A's employment tax liabilities or Target 2's potential responsibility for those amounts.

Similarly, the record contains significant information about the examination of Target 2's 2009 and 2010 returns, and there is no indication that petitioner's information was at all helpful to that examination. Nor has petitioner alleged that petitioner's information related to the adjustments made in the examination, which concerned unreported fees Target 2 received by preparing income tax returns and a disallowed tax exemption Target 2 claimed with respect to Target 2's adult child.

Again, petitioner does not appear to dispute these conclusions. The only argument petitioner's Response makes specifically with respect to Target 2 is that a document in the administrative record states Target 2 "was not under examination until [petitioner's] Form 211 was received and processed." Pet'r's Resp. ¶ 6. Petitioner's Response also states that petitioner knew Target 2 and the companies Target 2 "used in committing tax fraud" well. *Id.*

Petitioner's first statement is demonstrably true—SB/SE opened its examination of Target 2's 2009 and 2010 tax returns on August 14, 2012, after the WBO referred petitioner's claims to SB/SE for the second time. And petitioner's second statement may also be true. But under *Lissack*, neither statement is sufficient to entitle petitioner to an award. As the D.C. Circuit explained, it is not enough for a whistleblower's claim to be a "but for" cause of the IRS opening an examination, or for a whistleblower to provide background information about a target. *Lissack v. Commissioner*, 68 F.4th at 1324. Instead, the whistleblower must "identify underpayments and provide information that advances to some substantial degree the IRS's recovery of those underpayments." *Id.* And, as already discussed, there is no indication in the record, nor does petitioner allege, that petitioner's information related to the unreported tax preparation fees or the disallowed tax exemption that gave rise to the adjustments in the examination of Target 2's returns.

Thus, with respect to Target 2, we again see no abuse of discretion.

[*17]  C.    *Target 3*

The amounts assessed by the IRS with respect to Target 3 consist of (1) trust fund penalties and interest totaling more than $1 million, apparently related to Company A's employment tax examination, and (2) tax, interest, and penalties totaling almost $60 million ordered as restitution following Target 3's criminal conviction.  With respect to the trust fund penalties, the WBO's determination does not constitute an abuse of discretion for the same reasons described in our discussion of Target 2 above.  *See supra* Discussion Part III.B.  With respect to the restitution amounts, we find no abuse of discretion for the reasons below.

First, the record does not indicate that petitioner's information caused Revenue Officer A to refer Target 3 to CID.  As already discussed, Revenue Officer A was pursuing a fraud referral and a meeting with a Fraud Technical Advisor before petitioner provided her with any information related to Target 3.[8]  According to Revenue Officer A's notes, petitioner made no allegations against Target 3 at their first meeting.  At their second meeting, petitioner alleged that Target 3 had a practice of buying companies, stripping them of assets, and filing for bankruptcy.  But these allegations had nothing to do with the issues Revenue Officer A was developing and, after petitioner made the allegations, Revenue Officer A told petitioner that she could not accept any information or records and that petitioner should file a whistleblower claim.  Petitioner took her advice and filed a claim a few weeks later, but that claim contained no specific allegations related to Revenue Officer A's work.  Moreover, she did not review it.

Following the referral to CID, Target 3 was investigated and ultimately convicted of corrupt interference with the internal revenue laws, multiple counts of failure to file a corporate tax return, and two counts of failure to file a personal tax return.  The convictions for failing to file corporate tax returns related to corporations other than Company A and Company C.

As best we can tell, none of the information petitioner provided substantially contributed to the convictions the IRS ultimately secured.  For example, we see no allegation in petitioner's information that Target 3 failed to file individual income tax returns.  And the

---

[8] We note that the record includes only the pages from Revenue Officer A's case activity notes that mention petitioner (9 pages out of a total of at least 198 pages).

**[\*18]** corporations named in the indictment for which Target 3 failed to file corporate tax returns are mentioned in petitioner's information only briefly—for example, they are included in an organization chart and on a list that reflect some of the many corporations with which Target 3 had dealings. Additionally, publicly available filings (e.g., articles of incorporation and annual reports) for one of the corporations are included in petitioner's information. But nearly all of petitioner's information relates to other companies. And nowhere in the documents petitioner provided are there any specific allegations of wrongdoing (or evidence of such) that appear related to the corporations or to Target 3's convictions.

This observation is consistent with the Form 11369 CID Special Agent A prepared. In a memorandum attached to the Form 11369, the agent stated that that his investigation was started independent of petitioner's information and that contacts with petitioner did not provide any evidence assisting the investigation. He elaborated that petitioner did not have first-hand knowledge of or work at the company that was the primary focus of the investigation. We see nothing in the record that refutes these contentions—indeed the record (including the supplementing materials added at petitioner's request) supports them. We therefore conclude that it was not an abuse of discretion for the WBO to deny petitioner's claim for an award with respect to Target 3.

Petitioner's primary objection to this conclusion is that, in petitioner's view, the administrative record, as supplemented by testimony from Target 3's trial and Revenue Officer A's activity report, suggests that it was petitioner's information that caused Revenue Officer A to refer Target 3 to CID and ultimately led to Target 3's conviction. Thus, petitioner contends, summary judgment is inappropriate because material facts are in dispute regarding petitioner's role in the actions against Target 3. But these arguments fail for several reasons.

1.  *Referral to CID*

As we have discussed, we disagree with petitioner's reading of the record. Contrary to petitioner's contentions, a close reading of Revenue Officer A's notes strongly suggests that she was investigating potential fraud by Targets 2 and 3 before she ever spoke to petitioner. And the notes further reflect that, in the two meetings petitioner had with Revenue Officer A before filing Form 211, petitioner did not provide any information that substantially contributed to her investigation of the

**[\*19]** fraud issue. In fact, at their second meeting, Revenue Officer A told petitioner that she could not accept any records or information related to petitioner's fraud allegations, and that petitioner should file a whistleblower claim.

Additionally, under the D.C. Circuit's decision in *Lissack*, petitioner would not prevail even if we were to assume that (1) petitioner's information caused Revenue Officer A to refer Target 3 to CID and (2) CID opened the investigation of Target 3 because of the referral. As the D.C. Circuit explained, this kind of "but for" causation would be insufficient to entitle petitioner to an award because, as discussed above, the record does not support that petitioner's information substantially contributed to developing the specific issues that led to Target 3's convictions. *See Lissack v. Commissioner*, 68 F.4th at 1324.

### 2. *Summary Judgment Standard*

Petitioner's position in response is that the administrative record is incomplete and does not show the extent of petitioner's contribution to the investigation of Target 3. Therefore, petitioner argues, there is a dispute of material fact regarding petitioner's information that precludes summary judgment.

But, as the Commissioner correctly points out, petitioner's argument mischaracterizes the relevant standard. As we have said, in cases where we review the administrative record for abuse of discretion, the normal summary judgment standard is not apt. Instead, summary judgment serves as a mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record, or whether the WBO's determination was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Van Bemmelen*, 155 T.C. at 72 (quoting *Kasper*, 150 T.C. at 21); *see also* Rule 121(j).

In petitioner's Motion to Remand and in the Response, petitioner repeatedly points to alleged inadequacies in the administrative record and argues that they preclude us from ruling in the Commissioner's favor. Petitioner contends, among other things, that notes taken by CID agents during meetings with petitioner are missing from the record, that interrogatory responses provided by the Commissioner do not meet the

**[\*20]** requirements of Rule 71,[9] and that further fact-finding (including witness testimony either at trial[10] or on remand) is needed given various discrepancies and indications that documents relevant to petitioner's claims were destroyed by the IRS.

We view these arguments as essentially contending that the administrative record here is incomplete. But the Court provided petitioner more than ample opportunities to demonstrate that the record should be supplemented. And in fact the Court ordered the supplementation of the record. Petitioner's current claims that the record should be supplemented yet again are unavailing in view of the procedural history of this case. Petitioner strategically gave up any efforts to add certain materials to the administrative record in exchange for the Commissioner's agreement to add certain other materials to the administrative record.

Specifically, petitioner previously filed a Motion to Compel Discovery (Doc. 79) that raised many of the same points raised in petitioner's recent filings. In the Motion to Compel, petitioner requested that the Court issue various orders to address holes and discrepancies petitioner perceived in the record. Petitioner, however, subsequently elected to withdraw the Motion to Compel in exchange for the Commissioner's agreement that testimony from Target 3's trial could be added to the administrative record.[11] We accepted the parties'

---

[9] The interrogatory responses indicate, among other things, that petitioner visited Revenue Officer A several times after she closed Company A's employment tax examination, that petitioner sometimes provided her with documents relating to Targets 1, 2, and 3 at these meetings, and that Revenue Officer A shredded the documents without taking any further action. They also indicate that the criminal investigation file for Target 2 was prematurely destroyed by the IRS after the investigation was closed. Petitioner argues that the failure of the interrogatory responses to comply with Rule 71 prevents the Commissioner from relying on them. We note that the interrogatory responses were not made part of the administrative record. Moreover, we would reach the same result in this case regardless of whether or not we considered the interrogatory responses. Although we do not approve of the steps Revenue Officer A took with respect to the documents petitioner submitted, her actions suggest she did not view the information as aiding the IRS's efforts in the relevant proceedings.

[10] As we have said, in a "record rule" whistleblower case, there is no trial on the merits. *Van Bemmelen*, 155 T.C. at 79.

[11] Petitioner relies on the trial testimony to show CID Special Agent A was not actively pursuing Target 3 until he received the fraud referral from Revenue Officer A. We accept this point as true. But the trial testimony does not establish that

**[\*21]** agreement in this regard and implemented the agreement in an Order served April 14, 2023.

Having made this strategic decision, petitioner cannot now be heard to complain about a purported incompleteness of the administrative record. We of course consider any inadequacies in the record as part of our analysis of the merits, but we do not require a perfect record to reach a decision. Reviewing for whether there was an abuse of discretion, we decide whether the record before us, as supplemented, adequately supports the WBO's determination. And the standard we apply is a deferential one: we confine ourselves to ensuring that the WBO's determination was "within the bounds of reasoned decisionmaking," *Van Bemmelen*, 155 T.C. at 72 (quoting *Dep't of Com.*, 139 S. Ct. at 2569), which includes accepting the WBO's factual determinations so long as they are not clearly erroneous, *see Kasper*, 150 T.C. at 23.

The record in this case adequately supports the WBO's determination. Petitioner is correct that the record is not perfect. But it is good enough. While we have already explained our reasoning with respect to each of the targets, for completeness, we will again review below petitioner's key areas of disagreement with the Commissioner.

Consider first the excerpts from Revenue Officer A's case activity record. Petitioner's Motion and the Response make much of these documents, using a few key quotations to argue that petitioner's information was critical to starting the criminal investigations of Targets 2 and 3. But upon closer inspection, the excerpts show that Revenue Officer A had progressed far in her work, including with respect to fraud referrals for Targets 2 and 3, before she ever spoke to petitioner. And aside from nonspecific allegations petitioner made orally at their early meetings, the excerpts further suggest that Revenue Officer A did not accept any evidence from petitioner relating to potential fraud before she referred Targets 2 and 3 to CID. Instead, she encouraged petitioner to provide evidence to the WBO.

Similarly, the record includes all the documents petitioner provided to CID Special Agent A that were retained in Target 3's criminal file. The documents support petitioner's claims that petitioner met with CID Special Agent A and provided information with the desire

---

petitioner's information caused the referral. And, even assuming for the sake of analysis that it did, under *Lissack v. Commissioner*, 68 F.4th at 1324, petitioner still would not be entitled to an award, as we discuss further below.

**[\*22]** of assisting in the investigation of Target 3. But as a substantive matter, the documents appear only tangentially related to the convictions the IRS ultimately secured. It is not evident how anything in the documents would have contributed substantially to the convictions. Indeed, most of the documents discuss entities and transactions that appear entirely unrelated to the convictions.[12]

Even now, although petitioner alleges that petitioner spoke to IRS agents numerous times, that the agents were eager to speak with petitioner and solicited petitioner's help, and that petitioner provided useful information to them, petitioner is unable to articulate what specific information petitioner provided to the IRS that would have substantially contributed to any of the assessments the IRS ultimately made. The closest petitioner comes to such an assertion is pointing to a chart petitioner provided to CID Special Agent A, identifying entities and individuals connected with Target 3, and to a canceled check executed by Target 3. But petitioner has not explained how this information substantially contributed to any of Target 3's convictions.

Finally, even if we accept as true many of the disputed points that petitioner presses—including that (1) the IRS took a greater interest in Targets 1, 2, and 3 because of petitioner's allegations and even opened examinations or investigations because of petitioner, (2) petitioner met frequently with CID agents who welcomed petitioner's help, (3) CID Special Agent A once asked petitioner if petitioner would be willing to testify against Target 3, and (4) Target 1 once called petitioner to threaten petitioner and petitioner reported this conversation to CID Special Agent A—it would not be enough for petitioner to prevail. That is because the record before us is devoid of evidence that petitioner provided any specific information that substantially contributed to assessments the IRS actually made. *See Lissack v. Commissioner*, 68 F.4th at 1324.

---

[12] As petitioner points out, the WBO did not consider Revenue Officer A's case notes, the documents petitioner provided to CID Special Agent A, or the testimony from Target 3's trial in making its original determination. Those materials were added to the administrative record during the proceedings before our Court. But given that the materials generally either support the WBO's determination (the case notes and documents petitioner provided) or are neutral (the trial testimony, *see supra* note 11), the WBO's failure to consider the materials was harmless error and does not warrant a remand. *See, e.g.*, *Kasper*, 150 T.C. at 27–28.

**[\*23]** IV.  *Conclusion*

To summarize, after reviewing the administrative record, as supplemented, we conclude that the WBO's determination to deny petitioner's claims for an award was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Van Bemmelen*, 155 T.C. at 72 (quoting *Kasper*, 150 T.C. at 21).  And there is no need for a remand.  We therefore will grant the Commissioner' Motion for Summary Judgment and deny petitioner's Motion for Remand.

To reflect the foregoing,

*An appropriate order and decision will be entered.*